## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>     v.<br><br>WILLIE B. ROBINSON III,<br><br>               Defendant. | No. 23 CR 537-2<br><br>Honorable John F. Kness |

## DEFENDANT WILLIE B. ROBINSON III'S SENTENCING MEMORANDUM AND OBJECTIONS AND CORRECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Defendant Willie B. Robinson III ("Willie"), by and through his attorneys, Pravin Rao and Gina Buschatzke, submits this Sentencing Memorandum pursuant to 18 U.S.C. § 3553 and Local Criminal Rule 32.1(g), in advance of his sentencing hearing, currently scheduled for Thursday, March 13, 2025 at 1:30 p.m. This Memorandum apprises the Court of Willie's background and involvement in the offenses alleged by the Government and offers information relating to sentencing factors in this case.

## I. INTRODUCTION

Willie is known by those close to him (his family, friends, and clients) as a compassionate and reliable individual. Exs. A–K. Willie now appears before this Court, accepting responsibility for his actions and expressing his remorse. In determining the appropriate sentence, Willie respectfully requests that this Court consider that (i) the 1:500 MDMA to marijuana conversion ratio prescribes a sentencing range that is unfairly severe and incompatible with 18 U.S.C. § 3553(a);

(ii) he has four young children who rely on him for financial support and as a caretaker; (iii) he is a good father that is eager to get back to his children and family; and (iv) the chances of his recidivism are low. Willie therefore respectfully requests that this Court impose a sentence below 30 months insofar as it avoids a gross sentencing disparity and achieves the purposes of sentencing articulated in 18 U.S.C. § 3553(a). Such a sentence is consistent with Probation's 30-month recommendation after its extensive investigation of Willie's character, conduct, and background. Sentencing Recommendation ("SREC") at 1.

## II.    BACKGROUND

Willie is a 33-year-old son, grandson, brother, and above all, a devoted father to his four children. *See generally* Exs. A– K. Indeed, he is "foremost a very loving father . . . and tries to do his best for [his children]." Ex. C. Willie has a deep sense of duty to his children and wants nothing more than to provide for them and to shield them from the struggles that he faced growing up, including physical abuse and his mother's hardships as a single parent of multiple children. *See, e.g.*, Ex. B ("Growing up, Willie and I both faced challenges, but one of his defining traits has always been his sense of responsibility toward our family and those he cares about."); Ex. A at 1–2.

Indeed, Willie has strived to provide his children with safety and stability in part because his childhood lacked these qualities. When Willie was approximately two years old, his parents divorced due to his father's physical abuse, emotional abuse, and infidelity. Presentence Investigation Report dated January 30, 2025

("PSR") ¶ 45; Ex. A at 1–2. The divorce undoubtably shaped Willie's childhood: his parents' animosity towards one another exacerbated the already difficult nature of Willie's upbringing in a broken home. PSR ¶¶ 45–47; Ex. A at 1–2. It also exposed Willie to constant strife and upheaval. Willie lived with his father during the week and with his mother on the weekends, forcing him to regularly adjust to diametrically opposite environments. PSR ¶¶ 45–46.

Willie's mother worked multiple jobs to provide for Willie and his siblings. Ex. A at 1. As a result, she could not always be present to provide guidance to or spend time with Willie. *See id.; see also* PSR ¶ 47. Despite this, she tried to surround Willie and his siblings with good role models and ensure they were involved in the community, for example, through church. Ex. A at 1. She also required Willie to complete his homework and his chores, providing him structure. *See id.* Still, Willie witnessed his mother struggle to make ends meet as a single parent with multiple kids. *See id.*

Conversely, Willie had a complex and strained relationship with his father, an ex-marine, and his father's partner. *See* PSR ¶¶ 45–46; *see also* Ex. A at 2. His father would spend time with Willie and even coached his youth football team. PSR ¶ 46. Yet, just like his mother, Willie suffered physical abuse at the hands of his father. *Id.* As Willie grew older, his father's physical discipline progressively became more extreme. *Id.* For example, Willie's father began smacking Willie's hand when he was a little boy and later would punch Willie in the stomach or chest when he was a teenager. *Id.*

Unfortunately, the only similarity between living with his mother and father is that both kicked Willie out of their houses while he was still a teenager. *Id.* ¶ 46–47; Ex. A at 2. Willie spent his remaining teenage years as an itinerant, living temporarily with different friends. PSR ¶ 47. As a result, Willie experienced panic attacks, anxiety, and significant stress. *Id.* ¶ 58. This led Wille to self-medicate with marijuana and fall victim to the circumstances of his environment. *Id.* ¶¶ 58, 60.

The above-described experiences with each parent instilled in Willie a deep desire to be independent and a lasting aversion to being a financial burden on his family—even if it were to his own detriment. *See id.* ¶ 55; Ex. A at 1. Unfortunately, this mindset, coupled with financial struggles in 2010 (when Willie learned that he was going to be a father) and 2013 (when Willie lost financial aid to attend school), underpinned two regrettable choices that led to criminal convictions, but for which Willie served no prison time. PSR ¶¶ 32–33, 51.

Remarkably, and notwithstanding his difficult upbringing, Willie managed to create a stable life for himself and his children. *See id.* ¶ 51; Ex. A at ("He has worked to be a better person because of his children."). For nearly a decade, Willie made persistent attempts to support himself and his children through legitimate means and to follow the law, which is evidenced by his lack of criminal convictions between 2015 and October 2023 when he was arrested for the instant offense. *See, e.g.*, PSR ¶¶ 65–76 (compilation of Willie's employment record reflecting jobs as a line cook, musician, and personal trainer); *id.* ¶¶ 32–33 (compilation of Willie's criminal history).

Willie has also learned to lean on his family when needed. In 2022, for example, and in an effort to support his children through legitimate means, Willie put his music career on hold and accepted financial assistance from his family and girlfriend, to enroll in a program at the University of Illinois at Chicago to become a certified personal trainer. *Id.* ¶ 62; Ex. B. Since then, Willie has steadily worked and obtained multiple certifications to further his career. PSR ¶¶ 62–63. At work, he has a reputation for being dependable, community-oriented, and committed to helping his clients improve both physically and mentally. Ex. F. He also prioritizes his clients' well-being over his own, as evidenced by the fact that he continues to train and rehabilitate those who can no longer afford his services. Exs. E, D.

Still, even with his budding career and his family's support, Willie has struggled to make ends meet with his unpredictable commission-based income and various costly court cases to ensure he has partial custody of or at least visitation rights with his children. PSR ¶¶ 51, 64; Ex. G. Unable to fully support his children and not wanting to burden his family with requests for additional financial assistance, Willie had a lapse in judgment and became involved in the current offense that led to the dire consequences that he and his family now face.

Willie acknowledges that he made a poor choice in his pursuit of a better life. He also realizes that he did not think through the negative impact that this conduct would have not only on him and his family, but also on the larger community. Willie wishes to put his criminal conduct behind him once and for all. His desire to move onto the next phase of his life and remorse for his actions are reflected in his

acceptance of responsibility and entering a guilty plea, which is consistent with his plan to continue steering his life in the right direction and focus on being a father. *See* PSR ¶ 59.

## III. SENTENCING STANDARD AND GUIDELINES

### A. Sentencing Standard

A reasonable sentence in a criminal case is first determined by calculating the sentence range as enumerated in the advisory Guidelines, and second by incorporating the relevant sentencing factors as set forth in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (citing *United States v. Dean*, 414 F.3d 725, 727 (7th Cir. 2005)). A sentencing judge must conduct this two-step analysis to ensure a reasonable sentence is imposed. *Holt*, 486 F.3d at 1004.

In determining an appropriate sentence, the Court is required to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The overarching principle in sentencing is that the Court must "impose a sentence sufficient, but *not greater than necessary*, to comply with the [sentencing purposes] set forth in [§ 3553(a)(2)]." 18 U.S.C. § 3553 (emphasis added).

Those purposes include:

(2) the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocation training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). In addition to these guiding principles, courts are also required to consider other factors. These factors include "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (18 U.S.C. § 3553(a)(6)) and "the kinds of sentences available" (18 U.S.C. § 3553(a)(3)).

A sentencing court may not presume that the advisory Guidelines range is reasonable. *Gall*, 552 U.S. at 50. Indeed, a court need not accept the Sentencing Commission's penological framework at all and, instead, may adopt its own. *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2008).

Under post-*Booker* case law, the sentencing judge has wide discretion to analyze and weigh the circumstances of the offense and character of the offender in the sentencing decision. *United States v. Carter*, 538 F.3d 784, 797 (7th Cir. 2008) (deferring to district court's downward departure based on the "articulated reasons for the variance from the advisory guidelines").

In determining an appropriate sentence, a court must make an individualized assessment based on the facts presented. *Id.* Indeed, "sentencing is never abstract: the district court is required by statute to tailor its sentence to the particular defendant before it." *United States v. Solomon*, 892 F.3d 273, 279 (7th Cir. 2018). The U.S. Supreme Court has emphasized that having "the fullest information

possible concerning the defendant's life and characteristics" is "highly relevant—if not essential" to the sentencing process. *Pepper v. United States*, 562 U.S. 476, 480 (2011) (internal quotation marks and citation omitted). "Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant." *Id.* at 488 (internal quotation marks and citation omitted).

**B.    Sentencing Guidelines Calculation**

Each sentencing decision must begin by consulting the applicable advisory guidelines—here, the 2024 Guidelines. In Willie's case, Probation has calculated a total offense level of 21 and a criminal history category of I, which corresponds to a range of 37 to 46 months. PSR ¶¶ 15–25; ¶ 34; SREC at 1. Notwithstanding the Guidelines, Probation recommended a sentence of 30 months. SREC at 1.

**IV.    ANALYSIS OF § 3553(A) FACTORS**

Based on a host of mitigating factors and the entirety of the 18 U.S.C. § 3553 analysis detailed below, Willie respectfully requests that this Court sentence him to a term of imprisonment below 30 months. Such a sentence is consistent with Probation's recommendation. SREC at 1.

**A.    The Seriousness of the Offense.**

As noted above, Willie does not dispute Probation's sentencing calculation. The MDMA to marijuana conversion ratio in the Guideline's Drug Equivalency Table, however, instructs courts to treat one gram of MDMA as 500 grams of marijuana. § 2D1.1. This ratio overstates the seriousness of Willie's offense because it is scientifically unsound and outdated. The Court should exercise its independent

judgment and vary downward from the Guidelines range to reach a sentence that is no greater than necessary to serve § 3553(a)'s objectives.

In *Kimbrough v. United States*, the Supreme Court held that district courts may vary from the Guidelines range based solely on a policy disagreement with the Guidelines. 552 U.S. 85, 91 (2007). ("[I]t would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes."). Accordingly, "district judges are at liberty to reject any Guideline on policy grounds—though they must act reasonably when using that power." *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010).

Like the 1:100 crack cocaine to powder cocaine conversion ratio at issue in *Kimbrough*, the 1:500 MDMA to marijuana conversion ratio is empirically unsupported and does not accurately reflect our national experience with MDMA. As a result, the ratio prescribes sentencing ranges that are unfairly severe and incompatible with § 3553(a). Like other courts have done, this Court should use its authority under *Kimbrough* to issue a downward variance to the applicable sentencing range to avoid adding unnecessary time to a sentence based on long-discredited assumptions about the harmfulness of the offense. *See United States v. Qayyem,* 2012 WL 92287, at *4 (S.D.N.Y. Jan. 11, 2012) (reducing 1:500 MDMA to marijuana equivalency to 1:200); *United States v. McCarthy*, 2011 WL 1991146, at *3 (S.D.N.Y. May 19, 2011) (same); *c.f., United States v. Kamper*, 748 F.3d 728, 741

(6th Cir. 2014) (holding that a district court erred by concluding that it did not have the power to exercise discretion to depart from the MDMA to marijuana ratio).

In support of this request, Willie adopts and incorporates the arguments made in co-defendant Nathaniel Butler-Ludwig's Sentencing Memorandum, which demonstrate that the MDMA to marijuana ratio lacks an empirical basis and is otherwise flawed. ECF No. 60 at 6–18 ("Butler-Ludwig Memo"). To avoid repetition, this Memorandum will not discuss in detail each argument made in the Butler-Ludwig Memo and during Butler-Ludwig's sentencing hearing. The evolution of the Commission's 24-year-old conversion ratio as well as its faulty premises and the unfulfilled social harms of MDMA, however, require additional discussion.

In assessing the seriousness of drug offenses, the Guidelines generally treat the quantity of drugs involved in an offense as a proxy for culpability. *See* U.S. Sentencing Guidelines Manual § 2D1.1(c). Accordingly, the Sentencing Commission compares quantities across different drug types by using drug-to-drug ratios. After conducting a congressional-directed study related to the manufacturing, trafficking, and effects of MDMA, the Commission increased the MDMA to marijuana conversion ratio fourteenfold from 1:35 to 1:500. *See* U.S. SENTENCING COMM'N, REPORT TO CONG.: MDMA DRUG OFFENSES, EXPLANATION OF RECENT GUIDELINE AMENDMENTS (2001).

In doing so, it compared MDMA to cocaine, which has a 1:200 conversion ratio, and determined that (1) MDMA was a neurotoxin (*i.e.,* tending to cause brain and nervous system cell death) and thus more harmful than cocaine, (2) MDMA was

uniquely marketed to—and prevalent within—the youth, and (3) unlike cocaine, MDMA was both a stimulant and a hallucinogen. The continuing validity of these three findings, however, has eroded over time and no longer stands.

*First*, the Commission's designation of MDMA as a neurotoxin is now, at best, unsettled and incomplete. *See Qayyem,* 2012 WL 92287, at *4 ("Whether MDMA is in fact neurotoxic remains a matter of debate in the scientific community."); *McCarthy*, 2011 WL 1991146, at *3 (noting that "the Commission's analysis of [MDMA's] impacts-particularly as compared to cocaine–was selective and incomplete"). Notably, the studies underlying this finding have been questioned and discredited. *See* Butler-Ludwig Memo at 13–14. That is not to say that MDMA is harmless. It is clear, however, that the Commission overstated the extent to which MDMA is harmful, especially relative to cocaine, in reaching the current conversion ratio. *See McCarthy*, 2011 WL 1991146, at *3 (discussing the ways in which cocaine is "significantly more harmful than MDMA").

*Second*, the Commission's finding that MDMA is aggressively marketed towards—and used by—the youth of the nation must be understood within the context of the time it was made. The 24-year-old conversion ratio was set in the midst of heightened public concern over drug use, including MDMA and crack cocaine. Indeed, there are strong parallels between the formulation of the MDMA and crack cocaine ratios. Both findings were issued following congressional directives and in the midst of emotional public panic about drug use. Crack cocaine was widely associated with rising violent crime, rampant addiction, and overdose.

A decade later, the rising popularity of MDMA among teenagers and "rave culture" sparked a similar panic. *See Guidelines Stiffened for Selling MDMA*, Associated Press, Mar. 21, 2001 (quoting the acting director of the Office of National Drug Control Policy: "We never again want another 'crack epidemic' to blindside the nation").

Recent studies, however, have shown that MDMA is one of the least used substances by adolescents compared to others.[1] Moreover, the percentage of youth who use MDMA (including under its "Molly" and "ecstasy" street names) has declined since the 1990s and its prevalence among high school students, as of 2023, was at or near the lowest level it has been in decades.[2] It has also been shown to be a less serious medical threat than cocaine. *See McCarthy*, 2011 WL 1991146, at *3 ("Even controlling for the fact that cocaine is more commonly used than MDMA, cocaine is still approximately 16 times more likely to lead to hospitalization."). Time has not borne out the fears of Congress in relation to MDMA, just as time did not bear out the fears in relation to crack cocaine.

---

[1] *See* Kevin M. Gray and Lindsay M. Squeglia, <u>Research Review: What Have We Learned About Adolescent Substance Abuse?</u> 59(6) J. Child Psych. Psychiatry, 618, 627 (Table 1) (June 2018) (available at <u>https://pmc.ncbi.nlm.nih.gov/articles/PMC5771977/pdf/nihms929935.pdf</u>) (last accessed Feb. 27, 2025).

[2] *See* Richard A. Miech, et al., <u>Monitoring the Future: National Survey Results on Drug Use, 1975-2023: Secondary School Students,</u> U. Mich. Inst. Soc. Rsch. 1, 39 (available at <u>https://monitoringthefuture.org/wp-content/uploads/2023/12/mtf2023.pdf</u>) (last accessed Feb. 27, 2025).

*Third*, the Commission's characterization of MDMA as both a stimulant and hallucinogen has been rejected and discredited by other courts. *See e.g., McCarthy*, 2011 WL 1991146, at *3; *Qayyem*, 2012 WL 92287, at *4. Even if it had such properties, "comparing pharmacological properties using broad descriptors like 'stimulant' and 'hallucinogen' says little—if anything—about the relative harm posed by a drug." *Qayyem*, 2012 WL 92287, at *4.

To be clear, Willie is not discounting that the offense he committed is serious, nor is he arguing that the sentencing range was improperly calculated under the Guidelines.[3] The decades-old 1:500 conversion ratio, however, has not withstood the test of time, nor does it reflect society's current understanding of MDMA. It is therefore incompatible with the overarching purpose of § 3553(a) to mete out a sentence that is "sufficient, but not greater than necessary." Accordingly, Willie respectfully requests that the Court find a policy disagreement with the conversion ratio and vary downward from the scientifically unsound and outdated MDMA conversion ratio.

---

[3] Willie appreciates the seriousness of his conduct and acknowledges that while the Court may consider a non-custodial sentence in the instant action, the Court may determine not to afford the same level of consideration to a non-custodial sentence to the extent it may otherwise in other cases. *See, e.g.*, 18 U.S.C. § 3553(a)(3) (requiring courts to consider the "kinds of sentences available"); *United States v. Hoover*, Case No. 08-CR-50, 2008 WL 3539277, at *3 (E.D. Wis. Aug. 10, 2008) (the Court "ha[s] to consider the kinds of sentences available, including non-incarceration sentences, even when the guidelines recommend prison.").

### B. Need to Avoid Disparity in Sentencing.

Under 18 U.S.C. § 3553(a)(6), this Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In surveying MDMA trafficking cases, it is clear that district courts regularly award below-Guidelines sentences to defendants that exhibit mitigating characteristics similar to Willie's—a steady, commendable employment history, a clear commitment to raising and providing for a family, and a proven ability to lead a law-abiding life, including on supervised release. These courts have deemed below-Guidelines sentences sufficient to meet the purposes and goals set forth in § 3553. Willie respectfully submits that a sentence below the low end of the applicable Guidelines range, namely below 30 months, is similarly appropriate here.

*United States v. Nathaniel Butler-Ludwig*, **Case No. 1:23-CR-00537 (N.D. Ill.).** This Court recently sentenced Willie's co-defendant in the instant action to a 31-month term of imprisonment. ECF No. 68 at 2. Both Butler-Ludwig and Willie pleaded guilty to Count II in the indictment for possession with intent to distribute approximately a kilogram of MDMA. Plea Agreement, ECF No. 51. Both Butler-Ludwig and Willie have an offense level of 21 and a criminal history category of I with a corresponding Guidelines range of 37 to 46 months. Gov.'s Sen. Memo., ECF No. 59 at 4–5. Appreciating that each have different mitigating and aggravating factors, Willie respectfully requests that this Court consider Probation's recommendation of a 30-month sentence in the instant action after substantial investigation into Willie's character, conduct, and background.

**United States v. Phillip Stewart, Case No. 3:16-CR-00217 (D. Conn.).**

Phillip Stewart pleaded guilty to conspiracy to distribute and possess with intent to distribute approximately one kilogram of MDMA and a similar drug, MDA. ECF No. 95, *U.S. v. Stewart*, Case No. 3:16-CR-00217, at 2 (D. Conn.). Like Willie and Butler-Ludwig, Stewart and his co-conspirator were unknowingly in the process of selling MDMA to an undercover police officer and were arrested before the transaction was completed. *Id.* at 1. Stewart had an offense level of 21 and a criminal history category of I with a corresponding Guidelines imprisonment range of 37 to 46 months. Id. at ECF No. 94, at 3. Similar to Willie, Stewart had a "strong work history", had "been compliant with his conditions of supervised release[,] and [] sought to remain gainfully employed since his arrest." *Id.* at ECF No. 95, at 3. He also had three minor children that would be negatively impacted by a term of imprisonment. *Id.* Ultimately, the court sentenced Stewart to a 14-month term of imprisonment, far below the applicable Guidelines range of 37-46 months. *Id.* at ECF No. 101, at 1.

**United States v. Iyad Abdullah, Case No. 1:08-CR-00101 (E.D. Va.).**

Iyad Abdullah was sentenced to a term of imprisonment of 24 months after pleading guilty to conspiracy to possess with intent to distribute MDMA. ECF No. 380, *U.S. v. Abdullah*, Case No. 1:08-CR-00101, at 1 (E.D. Va.); *id.* at ECF No. 374, at 1. The conviction arose from Abdullah delivering 1,015 tablets of MDMA to an undercover agent. *id.* at ECF No. 374, at 1. Similar to Willie, Abdullah was a father of four young children and had a solid work history. *Id.* at 2. Moreover, Abdullah wrongly

attempted to alleviate financial burdens through drug trafficking instead of seeking help from other family members. *Id.* at 3. Abdullah had an offense level of 21 and a criminal history category of I with a corresponding Guidelines range of 37 to 46 months. *id.* at ECF No. 376, at 1. The court determined that a sentence of 24 months was sufficient but not greater than necessary to serve the purposes of 1335(a). *id.* at ECF No. 380.

### C.   History and Characteristics[4]

#### 1.   *Willie's dedication to his family, clients, and community is admirable.*

As the eleven letters of support demonstrate, Willie is known for helping and encouraging those around him. *See* Exhibits A–K. Notably, "one of his defining traits has always been his sense of responsibility toward [his] family and those he cares about." *See, e.g.,* Ex. B (explaining that Willie's "goal has always been to lift up [his] family and ensure the people in his life are supported and cared for"); Ex. G ("Family means everything to [Willie]."). "He is a devoted father to his four children, a supportive brother, and a dependable friend." Ex. B; Ex. H ("He is a dedicated father."); Ex. I ("Will works hard to provide his children with a stable nurturing environment.").

At his job as a personal trainer, Willie "has a reputation for being dependable, compassionate, and committed to helping others grow." Ex. F. He has demonstrated an "unwavering commitment to helping others improve their lives." Ex. E. Willie has even volunteered his time to help those in need at the gym when

---

[4] Please see sealed Addendum to the Sentencing Memorandum for additional background information.

they were going through tough times. In one instance, Willie continued to train his client at no charge for several months after she lost her job. Ex. E. On another occasion, after a gym member was diagnosed with health issues, Willie worked with him to develop a gym regimen and met with him several times a week at no charge to assist him with rehabbing his injury. Ex. D.

      **2.**    *Willie already has the tools to get his life back on track, resume his role as parent and provider, and contribute to society.*

As described above, Willie is committed to supporting his family, clients, and community. He financially provides for each of his four children, all under the age of 15. PSR ¶ 51. He also has joint custody of his two youngest children who live with him every Thursday through Sunday, during which Willie is their primary caretaker. *Id.* During any period of incarceration, Willie will be unable to fulfill his financial and caretaking responsibilities to his children, almost certainly leading to material hardship for his family.[5] Willie respectfully requests that this Court grant leniency in its sentence on this basis so that Willie may resume his role as a provider and caretaker as soon as possible. *See, e.g., United States v. Schroeder*, 536 F.3d 746, 756 (7th Cir. 2008) (holding that sentencing court was required to consider the effect of the absence of defendant on his immediate family members, not just defendant's responsibility for the adverse effects of his incarceration, in

---

[5] Amanda Geller, Irwin Garfinkel, and Bruce Western, *Paternal incarceration and support for children in fragile families*, 48.1 Demography 25, 37 (2011) (available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3220952/pdf/nihms-333135.pdf) (last accessed Feb. 27, 2025) (the decreased contributions by incarcerated men are not simply due to their being 'bad' fathers."); Ofira Schwartz-Soicher, Amanda Geller, and Irwin Garfinkel, *The effect of paternal incarceration on material hardship*, 85.3 Soc. Serv. Rev. 447, 460 (2011) (available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4020140/pdf/nihms474826.pdf) (last accessed Feb. 27, 2025) (the economic harms of paternal incarceration can be "explained only partially by poverty").

determining defendant's claim for leniency based on his role as caretaker for his daughter); *United States v. Ross III*, 501 F.3d 851, 854 (7th Cir. 2007) (vacating sentence where the district court was wrong to sentence defendant within the Guidelines range if it believed his personal characteristics, including family circumstances, warranted something lower); *United States v. Milne,* 384 F. Supp. 2d 1309, 1313 (E.D. Wis. 2005) (reducing defendant's sentence because, "as the sole supporter of a large family, a long period of imprisonment would have a very harsh effect on defendant's dependents.").

In addition, Willie has demonstrated a range of skills and entrepreneurial motivation in his employment, providing a smoother transition to a contributing member of society and source of support to his children after serving his sentence. *See* PSR ¶¶ 62–76. Willie is a certified physical trainer and is certified in cardiopulmonary resuscitation (CPR) and the use of an automated external defibrillator (AED). *Id.* ¶¶ 62–63. Prior to and following his arrest, Willie maintained lawful employment, including as a personal trainer at X-Sport and then at LA fitness. *Id.* ¶¶ 64–65. Upon his release, Willie intends to pursue additional certifications to further his career as a fitness trainer. *Id.* ¶ 59. Thus, Willie already has the education, means, and motivation to secure and maintain gainful employment upon release—employment that will allow him to support his children and contribute to society.

### D.  Limited Deterrent Effect of a Lengthy Sentence

It is clear from his expressions of sincere regret that specific deterrence is not required in Willie's case. *See* 18 U.S.C. § 3553(a)(2)(B). He knows how much pain and suffering his actions caused and will continue to cause his family, primarily his children. Indeed, Willie is aware that his absence will likely create instability in his children's lives that could have long-term negative consequences. Willie will forever regret missing upcoming once-in-a-lifetime milestones like his two youngest children's first day of kindergarten and his older children's formative teenage years. *See* Ex. C.

Moreover, since Willie has never served a custodial sentence, it will have a greater deterrent effect. *See, e.g.*, *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

It also bears noting that defendants with Willie's profile are unlikely to recidivate. According to a 2021 study conducted by the United States Sentencing Commission, 69.8% of all male offenders with a criminal history category of I, like Willie, do not recidivate. *See* U.S. Sentencing Comm'n, Recidivism Of Federal Offenders Released In 2010, at 5 (Sept. 2021) (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf).

Based on the severe pain and suffering both he and his family have already experienced due to this case, Willie's efforts to turn his life around, and his educational and employment history, the chances that Willie will recidivate upon release are exceptionally low, and the specific deterrent effect of a lengthy sentence will be limited in his case. *See* § 3553(a)(2)(C).

In terms of general deterrence, while prison sentences certainly send a message, a long prison sentence here has the potential to send the wrong message. Sentencing Willie to anything but below 30 months is likely to discourage defendants like Willie from admitting guilt and taking responsibility. *See* DOJ OFFICE OF JUSTICE PROGRAMS, FIVE THINGS ABOUT DETERRENCE (May 2016) available at https://www.ojp.gov/ncjrs/virtual-library/abstracts/five-things-about-deterrence ("Research underscores the more significant role that certainty plays in deterrence than severity — it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment."),

Willie has made efforts to accept responsibility, turn his life around, and prepare for life after an acknowledged period of incarceration. A punitive, burdensome sentence adds nothing further to any deterrence goals. In short, a lengthy sentence would have a limited general deterrent effect and an even more limited specific deterrent effect.

## V.   OBJECTIONS AND CORRECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND SENTENCING RECOMMENDATION

### A.   PSR at Paragraph 62

The PSR notes that Willie attended Prairie State College in Chicago Heights from 2009 until 2012 and Harry S. Truman College in Chicago from 2012 to 2013. Willie, however, attended Prairie State from 2009 to 2011 and Harry S. Truman College from 2011 to 2013.

### B.   SREC at Pages 1–2

Probation justifies its recommendation for a 30-month sentence based in part on its conclusion that Willie presents a high risk of recidivism, reasoning that sentences related to his two previous convictions did not deter him from his involvement in drugs. As described in more detail at § IV.D above, Willie respectfully disagrees that he poses a high recidivism risk as he has never served a custodial sentence.

### C.   SREC at Page 2

There appears to be a typo in Probation's recommendation that Willie "shall be placed on supervised release for a term of three years on *Count One*." (emphasis added). Willie respectfully requests that Count One be corrected to Count Two.

## VI.   CONCLUSION

Willie's conduct was serious in that it involved trafficking narcotics, but he accepted responsibility quickly after he was approached by law enforcement. PSR ¶ 10. Since his arrest in 2023, Willie has been compliant with the terms of pretrial supervision and has successfully maintained his employment. SREC at 2. Moreover, Willie has demonstrated an acceptance of responsibility for his actions and knows

that he will pay a severe personal price for his misconduct. Recognizing that sentencing is a multifaceted assessment, Willie would have this Court focus on the fact that the applicable 1:500 MDMA to marijuana conversion ratio is flawed and outdated, he has four young children who rely on him for financial support and as a caretaker, the chances of his recidivism are low, and most importantly, he is a good father and has career prospects. He is eager to remain with or get back to his children and family as soon as possible. Willie acknowledges that his actions were wrong, but the 37 to 46 months Guidelines sentencing range is disproportionate to the conduct at issue. Accordingly, an additional downward variance would be appropriate in Willie's sentencing.

After considering the Guidelines and the § 3553(a) factors as applied to the facts of this case, Willie respectfully asserts that a sentence below 30 months, with conditions deemed appropriate by the Court, is sufficient but not greater than necessary and would be appropriate to satisfy the purposes of sentencing in his case.[6]

---

[6] Willie also respectfully requests that this Court: (1) recommend to the Bureau of Prisons ("BOP") that he be designated to a BOP facility near Chicago; and (2) grant the opportunity for him to voluntarily surrender to the BOP after sentencing and before the BOP designates him to a facility, which is consistent with Probation's view that he is "a good candidate for voluntary surrender." SREC at 2. Willie wishes to serve his time, attempt to make up for his bad decisions, and get back to the life he has built for his family. Serving his time in relatively close proximity to his family will allow Willie to maintain a presence in his children's lives while he repays his debt to society.

Dated February 27, 2025

Respectfully submitted,
WILLIE B. ROBINSON III

By:   _s/Pravin Rao_

Pravin Rao
Gina Buschatzke
Perkins Coie LLP
110 N. Wacker Drive, 34th Floor
Chicago, Illinois 60606
(312) 324-8400
prao@perkinscoie.com
gbuschatzke@perkinscoie.com

*Attorneys for Willie B. Robinson III*

**EXHIBITS**

Exhibit A (Letter from Willie's mother)

Exhibit B (Letter from Willie's older brother)

Exhibit C (Letter from Willie's father's long-term partner)

Exhibit D (Letter from Willie's client and friend)

Exhibit E (Letter from Willie's client and friend)

Exhibit F (Letter from Willie's client and friend)

Exhibit G (Letter from Willie's friend)

Exhibit H (Letter from Willie's client and friends)

Exhibit I (Letter from Willie's friend)

Exhibit J (Letter from Willie's grandmother)

Exhibit K (Letter from Willie's three younger siblings)